## BETSY WEBSTER v. T. J. HEARD.

1—By the will of a testator a negro could not have been left part slave and
    partly a free person. She could not be sufficiently emancipated to capaci-
    tate her to take property by devise, and still be left so much a slave as
    to be disabled from dealing with it like other free persons exempt from
    disabilities not imputed to her.

2—A negress having been emancipated by the last will and testament of her
    former owner, and that will having been probated and established by a

court of competent jurisdiction, whose action in the premises has never been invalidated, her *status* as a free person is *res adjudicata*, and unless she was under a disability of infancy, lunacy, or the like, which is not pretended, neither her former master nor any court had the power to constitute a guardianship over her person or estate, and her conveyances of her property, duly executed, are to be dealt with in like manner as those of other free persons.

APPEAL from Galveston.   Tried below before the Hon. George R. Scott.

Judging by the calibre of the transcript of this cause, which contains over three hundred pages, this case excited no ordinary degree of interest in the court below; and this conjecture is greatly confirmed by the zeal, care, pertinacity and ability which characterizes the discussion of it in the briefs of counsel.

Betsy Webster, the appellant, was a woman of color, and once the slave of David Webster, who was a citizen of Galveston.   On the 8th of May, 1856, David Webster made and published his last will and testament, containing the following provisions :

"I bequeath to Betsy, my servant, (emancipated this date by me), all the real and personal and mixed estate belonging to me in the city of Galveston and State aforesaid, as well with all the horses, household furniture, effects and appurtenances appertaining to the same, to be held in trust for the use, benefit and behoof of said Betsy by Mrs. E. J. Hardin, of the city of Columbus, in the State of Georgia, as well with all the rents, profits, emoluments and debts accruing to the same,—nothing opposing the power granted said trustee, from disposing of said property at the pleasure and request of said Betsy, it being understood that the trustee is herein empowered to carry out the true intent of this will."   (Here follow bequests to sundry other persons, after which the will thus concludes):   "I hereby manumit, emancipate and set free my negro woman Betsy, and declare her to be entirely liberated from slavery, and entitled to all the rights and privileges of a free person with which it is in my power to vest in her."

Within a very few days after making this will, the testator died, and on the 27th of May, 1856, the will was admitted to probate by the County Court of Galveston county, and letters of administration, with the will annexed, were granted to H. B. Martin and F. B. Whiting.

In April, 1857, Martha Greenwood, of the State of New York, instituted suit in the Galveston District Court, to contest the validity of the will and have it set aside, so far at least as the bequests of freedom and property to Betsy were concerned. The plaintiff in this suit, Martha Greenwood, claimed to be a cousin and sole heir of David Webster. On the institution of this proceeding, Betsy Webster employed H. N. & M. M. Potter and W. P. Ballinger as her attorneys, to defend the will and her rights under it; and on the 22d of May, 1857, she executed to them, in consideration of their legal services, a conveyance of an undivided third of the property and estate which she should succeed in holding under the will. This instrument was subsequently confirmed by Mrs. Hardin, the trustee appointed in the will. The suit of Martha Greenwood was vigorously prosecuted until the July term, (1858) of the Galveston District Court, when it was dismissed by the court. At the November term, (1858) of the County Court, a decree was obtained vesting in Betsy all the property devised to her in the will. Among the property left by David Webster to Betsy were seven lots in block 268, in the city of Galveston, of the estimated value of $3,150. She agreed with her attorneys that they should take these lots at that valuation in part of their stipulated fee, which was one-third of the $22,000 worth of property secured to her by them. They negotiated a sale of the lots to T. J. Heard, the defendant in the present case, for about the price they allowed Betsy for them, and she, at their instance, and in conjunction with her trustee, Mrs. Hardin, executed to Heard a conveyance of the lots on the 12th of January, 1859. The deed was duly acknowledged by the makers, and was promptly recorded in Galveston county.

The object of the suit now at bar was to annul this deed to

the defendant, Heard, and to recover the lots mentioned, with rents, etc.  It was not instituted until February 7th, 1866, and it does not appear that up to that date there had ever been any question made by Betsy of the integrity of the deed, nor any reflection cast by her upon her attorneys in any other respect. Her original petition, however, now impugned it as "a base fraud and forgery, perpetrated against plaintiff by certain parties in conjunction with defendant, for the purpose of fraudulently swindling plaintiff out of her just, lawful and equitable rights and property."  By amendments this charge was amplified and reiterated with alleged details.

The defendant answered with a statement of the facts and considerations on which the deed had been executed to him by the plaintiff and her trustee.  In view of the summary disposition made of the case in the opinion of this court, it is not deemed worth while to give a detailed account either of the pleadings or the evidence.

The trial in the court below came off at the January term (1869).  All the papers and record in the proceedings of the County Court on the probate of David Webster's will, and the record and files in the case of Martha Greenwood to annul the will, besides much original testimony, were introduced.  A jury was waived, and the court rendered judgment against the plaintiff, from which she appeals.

It is but right, however, to mention that there was ample evidence in the record to the moderation and reasonableness of the arrangement made by the attorneys with the plaintiff, Betsy.  In fact, she had offered to other attorneys one-half of the property devised to her, and the Messrs. Potter and Ballinger were apprised of that fact when they only demanded of her the one-third.  So, also, it was clearly proved that she was kept fully advised from the first of the entire condition of the estate and of her rights, and particularly of the papers and conveyances to be executed by her.  She was shown to be a very intelligent, careful and resolute old woman; but she was going on eighty years of age when this suit was brought.

*Stancel & Stancel*, for the appellant.—The law contemplates that the parties who create trusts and powers have the exclusive right to select the person in whose integrity they have confidence, and on whose judgment they are willing to rely to execute the power and carry out the trust created.

David Webster appointed Mrs. E. J. Hardin trustee for plaintiff, giving her alone the power to carry out said trust. This was a confidential trust and could not be conveyed. (See 1 Sugden on Powers, 213, 214; Story on Agency, §§ 14 to 18; Hill on Trustees, 406; 2 Williams on Executors, 807; 2 Kent's Com., § 633; Cole v. Wade, 16 Ves., 27 to 43; Berger v. Duff, 4 Johns., ch. 368; Commercial Bank of Lake Erie v. Norton, 1 Hill, 505; Conklin v. Egerton, 21 Wendel, 430; Peter v. Bernly, 10 Pet., 533; Osgood v. Franklin, 2 Johns., ch. 19.) Mrs. Hardin did not accept the trust; therefore she had no legal capacity to convey the title of said lots in question to defendant. Betsy Webster, the plaintiff, and the party with whom the contract was made for the sale and transfer of the lots in question to defendant, had only an equitable interest in them, without any power whatever from the testator to sell them, and had been the former slave of the testator, and could not be emancipated only by permission of the Legislature of the State, or by being removed beyond the limits of the State, neither of which had been done, and therefore she had no legal capacity to contract nor sell property. (See Purvis v. Sherrod, 12 Tex., 140; Phileo v. Holliday, 24 Tex., 41; Hunt v. White, 24 Tex., 648; Bryan v. Walton, 14 Ga., 185.)

2. Was the conveyance made according to the intention of the testator as set forth in his will and the power therein delegated?

The intention of the testator must prevail in the construction of his will, if it can be ascertained from the language he has employed; and the various provisions of the will must be so construed as to uphold them all and give effect to the entire intention of the testator, if it can be done without violence to his language. It is conceded that the cardinal rule in the con-

XXXII—43

struction of wills is that the intention of the testator shall govern.

To this first great rule all others must bend; this principle is assented to in the construction of every testamentary disposition. It is emphatically the will of the person who makes it, and is defined to be the legal disposition of a man's intentions, which he wills to be performed after his death. His intentions are to be collected from his words, and must be carried into effect. To stop short of this would be an infringement upon that liberty of disposition of a man's own property, which is the most powerful incentive to honest industry and a free commercial country. To disregard rules of interpretation sanctioned by a succession of ages, and the decisions of the most enlightened judges, under pretence that the reason of the rule no longer exists, or that the rule itself is unreasonable, would not only prostrate the great landmarks of property, but would introduce a latitude of construction boundless in its range and pernicious in its consequences. It is of the utmost importance that rules of law once established should not be departed from, and it is the business of the courts, not to make laws, but to declare what the law is, whether it be wise or unwise. (See Constantine v. Constantine, 6 Ves., 100; Smith v. Bell, 6 Peters, 74 to 83; Moice v. Marshal, 1 Kelly, 102; Cook v. Weever, 12 Ga., 47; Hope v. Johnson, 2 Yerger, 123; Roberts and wife, v. West & Reid, 15 Ga., 141; Cleland v. Waters, 16 Ga., 496; Nailer v. Keightly, 2 Ves., 333; Paul v. Compton, 8 Ves., 375; Darhroon v. Peyton, 18 Ves., 27 to 41.) Courts will transpose and substitute words in wills, to carry out the intention of the testator. (See 1 Jarman on Wills, 437; 1 Williams on Executors, 299.)

The intention of David Webster is clearly and distinctly expressed in his will and not controverted. He created a power and a trust, and set forth the mode in which the power should be executed and the trust carried out, and selected Mrs. E. J. Hardin, the only person in whose integrity and judgment he had confidence to execute this power. It is a well settled rule

of law that powers must be executed in strict accordance with their language. (See Sugdon on Powers, 250; 2 Story Eq., 616; Hawkins v. Kemp, 2 East R., new edition, 204; Weeks and wife, v. Sego, 9 Ga., 204; 4 Taunton, 212; 17 Ves., 454.)

Mr. Ballinger, whose testimony is a part of this record, says that he and Mr. M. M. Potter made and entered into a written obligation with plaintiff, the terms and conditions of which are hereby referred to in the transcript, and also for the sale and conveyance of the lots in controversy; and at the time they made said contract with plaintiff, they knew that she had neither power nor legal capacity to make and enter into any such contract, because of her being only a *cestui que trust*, without any such power from testator, and because she was either a slave or free person of color, neither of which were recognized as citizens of the State, and capable of contracting according to the constitution and laws of Texas (see 12 Texas, 140; 24 Texas, 648, and the authorities therein cited); and that the contract with plaintiff was in direct violation of the intention and power of David Webster and of all the authorities upon the subject of the construction of wills and the execution of powers. (See the authorities above cited.) Mrs. E. J. Hardin being the only person to whom the power was given by testator to sell the lots in dispute, and she not having accepted it, thereby making herself wholly incompetent to transfer the title of said lots to defendant, and it further appears from the transcript of the Probate Court that the lots in question, at the date of defendant's deed, were in the possession of David Webster's administrators, and the debts of the estate not paid, and, according to the laws of Texas, the legal title to them was in the hands of the administrators in trust for the payment of said debts, and could not, at that time, be conveyed by plaintiff and Mrs. Hardin. (See Fisk v. Norveill, 9 Texas, 16; Hunt v. Horton, 12 Texas, 288; Howard v. Bennett, 13 Texas, 314; Bayne v. Garnett, 17 Texas, 330.) Hence, we say the deed of conveyance of the lots in question from plaintiff and Mrs. Hardin to defendant was void, because it

was made in violation of the intention of testator and the power delegated by him. A deed of conveyance that is void gives no color of title. (See Walker v. Turner, 9 Wheaton, 551; Brooks v. Marbury, 11 Wheaton, 78 to 90; Powell v. Harman, 2 Pet., 241.)

3. Was the deed of conveyance made without collusion and fraud upon the part of defendant and his confederates? The plaintiff, upon this issue, after proving that the deeds were in the handwriting of M. M. Potter, and after having notified the parties in whose custody they were to produce them in court for the purpose of evidence, and said parties by their counsel having appeared in court and objecting to the production of said original deeds, on the ground that suits were pending in court to recover the property conveyed by said deeds, which might be prejudiced by the production of said deeds, and that said deeds were intrusted to them in the cause of their professional employment as counsel in said suits, and that they were not bound to produce said deeds in evidence, and the court having sustained the objection, plaintiff then offered in evidence certified copies, from the records, of said deeds. The defendant objected to them as evidence, because plaintiff had shown no sufficient connection of defendant with said deeds to authorize their introduction as evidence, and for other reasons; which objections were sustained by the court, and the original deeds not produced and the copies ruled out. To which ruling plaintiff excepted, as appears from the bill of exceptions, duly certified and made a part of this record. Upon the pleadings and evidence, as set forth in the statement of facts, counsel for plaintiff and defendant having waived a jury, the case was submitted to the court, and the court rendered judgment in favor of defendant, and dismissed the suit at plaintiff's cost. To reverse said judgment, and to obtain from this honorable court such judgment and decrees as the law and facts authorize, this appeal is prosecuted and several errors assigned, viz: The court erred in sustaining the objections of the parties to produce the original deeds; the court erred in excluding the copies

of the deeds; that the judgment of the court was contrary to law and the facts of the case.

The main question in this case is as to the capacity and power of plaintiff and Mrs. E. J. Hardin to transfer the title of the lots in question to defendant. We have already briefly referred to this question, and cited the authorities which we think must control this case. The next point is as to the mode in which the conveyance was made to the defendant. Mrs. Hardin came to Galveston, Texas, in the month of June (1856) at the request of plaintiff, for the purpose of accepting the trust conferred on her by the testator, David Webster, and was informed by the Messrs. Potter that she could not do so, nor qualify as said trustee, because of her being a non-resident and *feme covert*, but they advised her to appoint an attorney in fact to execute said trust, which she did and returned to Columbus, Georgia. As Messrs. Potter were gentlemen learned in the law, we are authorized to presume that they knew the trust was a confidential trust, and could not be transferred. (See Sugden on Powers, 213; Hill on Trustees, 406; Williams on Executors, 807; 2 Kent's Com., § 633; Cole v. Wade, 16 Ves., 27 to 43; Commercial Bank of Lake Erie v. Norton, 1 Hill, 505, and the authorities therein cited.) And that Mrs. Hardin had no authority to authorize an agent to execute a power which she could not nor did not accept herself, see Story on Agency, §§ 14 to 18. A principal can not authorize an agent to do that which he has no authority to do himself. It is conclusive from Mrs. Hardin's own testimony that she did not accept said trust, and she only permitted her name to be used in connection with this transaction at the suggestion of Messrs. Potter, upon the presumption that plaintiff's interest in the protection of her property required it, without thinking that she had no authority to do so, or knowing anything about Potter's motives in asking her to do so; and it certainly would be a novel proceeding in courts to recognize the transfer of powers or authorities from parties that had none themselves.

It further appears that at the May term (1856) of the County Court of Galveston county, letters of administration were granted to H. B. Martin and T. B. Whiting on the estate of David Webster, deceased, and that said administrators took charge of said estate; and on the 16th day of April, 1857, suit was filed in the District Court of Galveston county by one Martha Greenwood, of the State of New York, against the administrators and heirs-at-law of David Webster, deceased, to contest and set aside said Webster's will, and on the 22d day of May, 1857, H. N. & M. M. Potter, and W. P. Ballinger, attorneys-at-law, made and entered into a written obligation with plaintiff, in which she agreed to give them one-third of her interest in said estate for their services in defending the suit against said will, and to take care of her interest in said estate until it was finally secured to her, without the knowledge or consent of Mrs. E. J. Hardin, whom they afterwards pretend to recognize as plaintiff's trustee, merely to give some legal appearance to the transaction; and on the 3d day of July, 1857, an answer was filed to the suit of Martha Greenwood v. The Administrators of David Webster, in the District Court of Galveston county, by Messrs. Potter and Ballinger, in the name of Mrs. Hardin, when it appears, from Mrs. Hardin's depositions and her letter to Messrs. Potter, dated Columbus, Ga., October, 1857, approving the contract with plaintiff, that she knew nothing of the existence of said suit until October, 1857. Fraud may be proved by circumstantial evidence. (Thompson v. Shannon, 9 Texas, 536; Graham v. Roder, 5 Texas, 141.)

Messrs. Potter's business connection with this estate, to say the least of it, was certainly very inconsistent, and shows either a want of discretion or bad faith upon their part. They advised Mrs. Hardin that she could not accept and qualify as plaintiff's trustee, and upon their advice she returned home to Columbus without accepting it; they also advised her to appoint an attorney in fact, to do that which they advised she was legally incapable of doing herself.

We understand the rule of law to be that the principal can not give to his agent authority which he has not got himself. While Messrs. Potter represented their own interest in settling and securing the amount of their fees with plaintiff, they also represented plaintiff in corresponding with Mrs. Hardin, and also defendant in securing the deed to the lots in question from plaintiff to defendant. When it became necessary to divide the property and pay the counsel fees to Messrs. Potter and Ballinger, as per written contract between them, Mrs. Hardin was neither consulted nor asked to be present to give her consent to the transaction, but she was in Columbus, Georgia, where she knew nothing about it, only as represented to her by the Messrs. Potter; at the same time, plaintiff being an ignorant negro, and could not know anything about the value of property, and the estimate and division was made with plaintiff, who was without capacity, power, or judgment to do so, and thereafter Mrs. Hardin's signature was procured to the deed. Mrs. Hardin says, in answer to the 6th and 22d direct interrogatories, among other things, that she signed certain papers or documents brought to her at Columbus, Georgia, by her son, E. H. Hardin, relating to the disposition of certain lots in Galveston, Texas, belonging to Betsy Webster, which documents she did not read at the time of signing them, and did not know anything of their contents, nor the parties named, nor the property therein conveyed, if any, and says she only knew it was at the request of Betsy Webster, through her attorneys, the Messrs. Potter, and that they related to the disposition of some of her lots in Galveston; does not remember the date of the transaction, and this is all that she remembers to have done or been requested to do by Betsy Webster in regard to said trust. In answer to other direct interrogatories, she says she never accepted the trust, and never did anything in the execution of it, except as above stated; did not visit Galveston since June, 1856; remained at Columbus, Georgia, until December, 1867, when she passed through Galveston on her way to Waco, Texas, where she now lives. She was the only per-

son authorized by the testator to sell and convey the lots in controversy, and it is not pretended by defendant that they were purchased from her, or that she was at any time consulted in relation to the purchase of them, or had any knowledge of the trade until after it was executed by plaintiff, and she not accepting the trust, made herself wholly incompetent to give any legal effect to the deed of conveyance to defendant by signing it, and her signature to the deed was procured simply at the request of Messrs. Potter.

The whole transaction was in direct violation of the power created by David Webster in his will. The record of the Probate Court of Galveston county, which is a part of this record, shows that the seven lots in question, with all other property belonging to the estate of David Webster, were taken possession of by H. B. Martin and F. B. Whiting, as administrators of David Webster, and thereafter, at the November term (1858) of said court, an order was granted by said court vesting the title to the seven lots in question, with all other property bequeathed to plaintiff, in Mrs. E. J. Hardin, in trust for plaintiff, and discharging said administrators from the further administration of said estate, upon their turning over to said trustee all the property therein described and paying the balance of indebtedness; and it does not appear anywhere that the order was complied with and the property turned over as directed, but the administrators ignored the order of the court by continuing to administer the estate. No receipts from Mrs. Hardin for the property described in said order having been filed by the administrators, they were not and could not be finally discharged. (See Townsend v. Munger, 9 Tex., 300; Poor v. Boyce, 12 Tex., 440; Bayne v. Garrett, 17 Tex., 330.) Vouchers must be filed. (See Paschal, Art. 1317; Davenport v. Lawrence, 19 Tex., 319; Neill v. Hodge, 5 Tex., 489.)

It further appears from the record of said Probate Court, that on a previous application made by the administrators to sell one-third of a league of land in Wharton county, for the purpose of paying the expenses of said administration, and the

debts due by said estate, an order was granted by said court at its November term (1858) to sell the land on the first Tuesday in January, 1859, and the land was not sold at the time mentioned in said order, and the application being renewed for the same reasons, an order was granted at the January term (1859) of said court, to sell said land on the first Tuesday in April, 1859, which was done, and afterward the report of said sale made to the court.

By reference to this part of the record it will be seen that at the date of the execution of the deed to defendant for the seven lots in question, the debts and expenses of testator's estate were not paid, and that said lots were held by the administrators in trust for the payment of all incumbrances on said estate. This being true, neither plaintiff nor Mrs. Hardin had control of the lots, or legal authority to convey title to them. (See Fisk v. Norveill, 9 Tex., 16; Ansley v. Baker, 14 Tex., 613; Howard v. Bennett, 13 Tex., 314; Chandler v. Hudson, 11 Tex., 37; Hurt v. Horton, 12 Tex., 288.)

The record of the Probate Court shows a receipt from plaintiff, dated October 25th, 1859, for her interest in said estate; which receipt, if true, is in violation of the order of said court and void, and shows conclusively that the lots were in possession of the administrators at the date of defendant's deed.

Said lots were trust property, and so recognized by the Probate Court, and never were in possession or control of any trustee whatever. The effort of defendant to sustain his title to the property is an accumulation of testimony to show the fairness of the transaction, without attempting to justify the power or authority of plaintiff and Mrs. Hardin to convey the title of the lots to defendant. The primary objects of the courts is to see to it that the intention of the testator is carried out according to the power therein delegated. To defeat this would be to defeat the will of testator. (See authorities previously cited.) M. B. Hardin says, among other things, in his depositions, that he never had anything to do with this estate except to approve

the written contract between plaintiff and Messrs. Potter and
Ballinger.   Messrs. Potter's whole connection with this trans-
action, it would seem, raises a strong presumption of bad faith,
and the procuring of Mrs. Hardin's signature to the written
contract and the deed was, perhaps, for the purpose of accom-
plishing their own ends.   Believing, from the view we take of
the law in this case, that defendant has no title to the property
in controversy, and that the court below erred in its various
rulings on the law, and that the judgment of the court was
contrary to law and evidence, the appellant prosecutes this
appeal, and respectfully asks a reversal of said judgment upon
the errors assigned, and that this court render such judgment
in the case as the District Court ought to have rendered, or
reverse and remand for a new trial, as upon a view of the whole
case may seem to the court to be legal and right.

  *W. P. Ballinger*, for the appellee.—It is alleged that the
deed of Betsy Webster and Mrs. Hardin is void because they
had no legal power or capacity under the laws of Texas to
convey title to said property by deed.
  It is not contended by plaintiff that the will of Webster was
void; on the contrary, it was valid.   But it is alleged that in
order to carry it into effect, and complete the status of Betsy
Webster as a free woman, she must have been removed from
the State of Texas; that until then her status remained that
of a slave; neither she nor her trustee had any power of dis-
position of any part of this property; that her emancipation
now works the same effect that her removal would have pro-
duced, and makes her freedom consummate; but that all done
by her, or by her trustee, whilst in the actual, potential *de
facto* exercise of freedom and management of property, was
utterly null and void, can form the basis of no legal rights, no
equitable rights, no estoppel against her or her trustee; that
all are to be disregarded and swept out of consideration, and
that she now enters into the full fruition of all the legal rights
which she would have been entitled to claim under the will of :

Webster if it was now first promulgated, and no party gainsaying its operation in her favor.

The most laborious, studious, earnest, wise and beneficial services may have been rendered to her at her request and the request of her trustee; decisions of the courts of competent jurisdiction adjudicating her a slave, and adjudicating forever the invalidity of Webster's will, and fixing the title to all his property adversely to any right in her or her trustee, may have been prevented; her freedom, instead of her slavery, to new and unknown masters for eight long years, and her possession of competence and affluence instead of her utter indigence, may have been secured to her, and paid for fairly and reasonably out of her property; she may have sold property with covenants of warranty, and obtained for it its full value in gold. All this shall go for nothing, be of no obligation on her or her trustee; she shall make no compensation or return, but be entitled to reclaim all this property, in the face of her solemn deeds, by the decree of the highest court of justice of this State.

Because of any fraud, wrong or injustice? No. Because of any want of equity in that legal reason and justice established by courts, or in that moral sense which belongs to the bosoms of good and just men? No. But because of the want of legal capacity and power of her or her trustee to convey.

Such allegations of law, and such allegations of fact, as this case witnesses, could only emanate from a common source.

I will not here discuss the doctrine of Purvis v. Sherrod, 12 Texas. Both the plaintiff and myself, however, concur, as I understand it, in the consistency of Webster's will with that case; and in the right which Betsy had to her freedom under the will.

The point by plaintiff is, that her removal from the State was necessary to the consummation of the right, and until that she remained a slave, and under all the incapacities of the *status* of slavery.

This is a *non sequitur*, a perversion. Purvis v. Sherrod decided that it was necessary to a valid *devise* of freedom to a

slave that provision should be made for the extradition of the slave from the State. That manumission was not valid, intended to be enjoyed in this State.

But if the will was valid, it vested the *right* to freedom, and a person ceased to be a slave. The question of removal became a question between the court and the trustee, or a question for the State to enforce its policy of removal.

Suppose David Webster had manumitted Betsy and willed to Mrs. Hardin $1000 to remove her to Ohio? Suppose the administrators had paid over to Mrs. Hardin the $1000, to carry out this will; but instead of removing her to Ohio, Mrs. Hardin had pocketed the money, and left Betsy penniless and shiftless on our streets. Would any court have said that on this ground she continued, or again became a slave? No court ever did, or could have said so. Her status of slavery ceased by the will, her *title* to her freedom was perfect. The heir-at-law could have assumed no right over her. The question of her extradition would have been one for the State.

So in this case, the will of Webster, being consistent with her removal—admitting that to be a necessary condition to a valid emancipation—her right was fixed and perfect by the will; it was a condition subsequent, not precedent.

It is therefore utterly unfounded to assume that her non-removal from the State continued her in the status and under all the disabilities of legal slavery.

Suppose that the emancipated slaves in Purvis v. Sherrod, or their trustee, when the issue of their freedom arose, had employed a lawyer, who, as he did, succeeded in establishing their freedom, could they have avoided performance of a fair and reasonable contract for his compensation; or would the trustee, paying a reasonable fee out of their funds or property, have been guilty of wrongful conversion, on the plea that so long as they remained in the State their status of slavery invalidated any agreement or any act respecting their property.

Take this case as it occurred. Here was a devise of freedom to Betsy, and of ample property and powers to her trustee to

consummate it in accordance with law. But whilst all the estate of Webster, including Betsy herself, are in the legal control of the administrators, a suit is brought by the alleged heir-at-law, denying the validity of the will, claiming title to her and to all the property.

How were her rights to be maintained? What were the powers and capacity of her and her trustee?

If we are to receive the law from the gentleman on the other side, they were utterly unable to make any valid contract whatever—could convey nothing—promise nothing—bind nothing. An entire incapacity to make a valid contract fettered the minds of both.    .

If the trustee can get her out of the State, then they are invested with a disposing mind and memory. But, remaining in the State, every faculty of contracting is denied to either, or both, respecting her devised property.

The infant has the power to contract for the necessaries of life; the married woman can bind her own property and that of her husband under the like exigencies; the alien enemy prisoner can make a valid contract for his ransom; an obligation for necessaries will be implied against the driveling idiot; for necessary food, or shelter, or medical service rendered to the slave in the days of slavery, the law would create a liability on the master. There is no human being who does not possess this faculty of self-preservation. Indeed, your honors, it is a right of the brute creation. If I find your horse or ox in the mire, and in peril of life or limb, you are bound to me for the reasonable labor I bestow which extricates it from the danger.

But we are gravely told that with the " magnificent estate," in the stylish rhetoric of the counsel, devised to this plaintiff and her trustee, in 1856, all, together with her freedom, put at issue and in jeopardy by the suit which involved them, there was no capacity or power to contract for their defense and preservation.

There was no question of capacity, however, in the case. The legal title was devised to Mrs. Hardin. *She* had capacity

to receive and to convey. The object of the devise, it is admitted, was lawful—viz: to consummate the freedom of Betsy and convey the property at her request. But it is insisted that Mrs. Hardin did not possess this power until Betsy's freedom became consummate; that the trustee could assert no rights and make no disposition of property until the *cestui que trust* became entirely free and able to contract.

But no reason whatever has been given for this, and it stands as no authority.

Such a construction would be wholly repugnant to the manifest intent of the will.

I have already shown how essential it might become, and did become, to the very existence and purposes of the trust, that the power of disposition, of contract, the powers under the trust, should be exercised whilst Betsy was yet in *de facto* slavery, in order to obtain her freedom.

The provisions of the will was that nothing should oppose " the power granted said trustee from disposing of said property at the pleasure and request of said Betsy. It being understood that said trustee is herein empowered to carry out the true intents of this will."

Here, then, was a large amount of property, real and personal, to be disposed of by the trustee at the pleasure and request of Betsy. How was this to be exercised? In order that Betsy should express her wishes, and make the necessary declarations of facts to direct the sale of a lot on the Strand to this purchaser, a lot on Postoffice street to that, and so on over twenty lots, and should dispose of her personalty to best advantage, did this will intend, or did the law require, that she must first reach some eligible stand point north of Mason and Dixon's line? Must she be located in New York or Philadelphia, in order to give instructions to her trustee in Georgia for the sale of property in Galveston? All this becomes supremely unreasonable. Grant it to be true that the law did not permit manumission for the donee to remain permanently in Texas, but that a devise of property to a trustee, intending

or consistent with the extradition of the slave, was valid, certainly the law would give all reasonable indulgence and facilities for the disposition of that property to the best advantage, and for the best interests of the devisee. And her subsequently failing to leave the State could have no possible effect to divest or abrogate the title which had been conveyed.

The brief of the appellant is based almost exclusively on the assumption that Mrs. Hardin never accepted the trust, or became trustee under the will of Betsy Webster, and that, therefore, no power of conveyance was vested in her.

What does counsel suppose necessary to constitute an acceptance? That Mrs. Hardin should come here and manage the property? This is an entire misconception. Such was not the character of the trust; no such duties were intended by the will. It was a mere naked legal trust. She was to convey the property at the pleasure and request of Betsy. She may or may not have performed all her duties. But to-day, in the face of this record and of this court, an acceptance of this trust by Mrs. Hardin is simply to be ignorant of all that constitutes acceptance of such an office or duty. Acceptance of trustee may be proved by any acts or declarations manifesting the intention. (Tiffany on Trusts, 510.)

Any act by which the trustee manifests intent to acquire or exercise any influence on the management of the trust property, will tend to fix the trust upon him. (Id., 511.)

It is a principle well settled that a trustee can not limit his acceptance of the trust, if he accepted at all. If he interfere at all, he will be deemed to have accepted the entire trust. (Id., 524.)

If a party does not intend to accept, great care must be had that no action on his part, with respect to the trust property, may fix him with the trust. (Id., 511; see, also, Hill on Trustees, 215, *et seq.*) Once accepted, it can not be disclaimed. (Id., 219.)

To execute a power of attorney, to bring an action respecting the trust property, to make frequent inquiries respecting

the trust property, are among the acts which fix an acceptance. (Hill on Trustees, 218.)

Mrs. Hardin came to Texas to accept the trust, and do all in her power to execute it. She found the estate being administered, and until that was complete no functions were necessary on her part. Residence here was neither her intention nor her duty. She left her son here as an attorney in fact—himself a devisee by the will—to do whatever might be necessary, or give her information, for the interests of Betsy. This was a conclusive acceptance of the trust.

Much of the brief of appellant is devoted to proof that Mrs. Hardin could not delegate her powers as a trustee.

Of course she could not *delegate* her powers. This is elementary.

There is no evidence of any such attempt at delegation. She appointed an attorney in fact, to exercise what peculiar duties we do not know.

There might have been, and were duties which, under the circumstances of the case, in her necessary absence, she could rightfully and prudently confide to an agent. Trustees may employ solicitor or agent, and govern themselves by their advice, but can not delegate entire management of the trust. (Hill on Trustees, 540.) May employ agent for ministerial duties. It is only necessary to retain supervision and control over the agent. (Id. 541, 474, note 1.)

Nothing in this case depends for its validity on the act of the agent.

But the appointment of an agent, even if in excess of her powers as trustee, is conclusive evidence of her own acceptance of the office of trustee.

Her functions were not for the management of the property; they were only to carry into effect the wishes of Betsy.

The trustee was to be the medium for the legal conveyance of Betsy's property. Webster selected her as trustee, because he knew from her character that she would not convey except in accordance with Betsy's wishes.

At every point·at which any act under the will as trustee could have been performed by her, she performed them.

For the most complete evidence of her intention to accept the trust and her actual acceptance, see her letter to Potter, and see her deeds.

All discussion, however, about the law of Texas affecting the *status* of Betsy Webster is superseded.  In this case it was settled by the decree of the Probate Court of Galveston county—a court of competent and rightful jurisdiction—never reversed, appealed from, or in any manner set aside.

That court validated the will of Webster and enforced it.

It distributed to and vested the property in Betsy Webster, here in Texas, and in her trustee, Mrs. Hardin.  It put them in the title to and the possession of the property.  It made a final decree of all the estate and property of David Webster to the parties entitled to it; and instead of including Betsy as part of the personalty of his estate, and decreeing her to any owner, it recognized her status of freedom, and her right to receive and enjoy the devises for her benefit, and invested full and unrestricted powers in her trustee.

That decision bound all the world, unless it was reversed, or the title vested by it was attacked as the law prescribed.

It can not be questioned collaterally.

It may or may not have contained error, which would have caused its reversal or appeal or *certiorari*.  I do not believe he did; but I do not argue that, because no doctrine is more elementary nor more fundamental than that it carried absolute verity so long as it remained in force.

This court will not revise the decree of the Galveston Probate Court.

It will hold it conclusive not only of everything which it directly adjudicated, but of everything which was involved or included in it, which was necessary as the basis of it.  (Hatch v. Garza, 22 Tex., 187–8 ; Watson v. Hopkins, 27 Tex., 637 ; Sutherland v. DeLeon, 1 Tex., 250; Lynch v. Baxter, 4 Tex.,

XXXII—44.

431; Neill v. Hodge, 5 Tex., 487; Toliver v. Hubbell, 6 Tex., 167.)

I beg permission of your honors to add a few more observations. If the allegations in this case had in them the element of truth, they would involve me personally. They could not be true ; they could not have occurred. Betsy Webster could not have been despoiled and robbed, her property confiscated and parceled out among others, as alleged, by a plot extending back to the commencement of the administration of Webster's estate, and I be ignorant of it, and not have participated !

But, upon this record, in the face of my brethren, with their jealous sense of all that concerns the integrity and honor of our profession, in the presence of this high and honorable court, I can most conscientiously declare that there is no case with which, in a professional experience, now pretty well matured, I was ever connected in which I have greater reason for an honest self-satisfaction than the proceedings which secured her freedom and her property to Betsy Webster. I look back to the day when it was almost the general professional opinion that she was *not* entitled to freedom or property, but was under the doom of slavery forever, to the day, when to maintain the contrary, required one to face the prejudices of this entire community.

I remember how studiously, how earnestly, how faithfully I devoted myself to her cause, and to win and secure for her what I believed were her rights.

She *was saved* her freedom, and saved an ample property— paying for it not oppressively, not as much she as offered to others ; not as much as she would have willingly given to us ; but paying for it at a rate which we felt that men of honor and justice would recogize that we had dealt fairly with Betsy Webster.

And what was the wrong committed towards her ? For what neglect or injury of her rights am I impeached ? It is, that I did not procure, or assist in, her forcible extradition from Texas.

To that alleged wrong I have already answered, that I believed it only necessary if, and when, demanded by the rightful authorities of the State.

She had strong local attachments. A native of the extreme South—of Florida—she had lived many years in this city in a home of comfort and taste—a white cottage embowered amid flowers and orange trees. All her affections clung to this island home, where she had lived with her former master, sustaining, perhaps, relations to him not sanctioned by law, but sanctified by all the sentiments of her nature.

She declared, as numerous witnesses testify, that she would remain here, and here would she, too, be buried—a slave, if it must be so, but that even to secure freedom and property she would not abandon the home where all her affections centered.

In this resolution she was inflexible; and a good Providence, if not good lawyers, guided her destiny.. In the enjoyment of that home, and of her own sacred feelings, dearer to her than all else, she has lived, undisturbed as any citizen of this community, even amid all the disorders and violence of civil war.

For my participation in *that wrong* I have made myself obnoxious to the learned censure and the virtuous indignation of the gentleman who discovered and is prosecuting this lawsuit, who adds the attainments which he displays at the bar to those which once resounded from the pulpit—whose knowledge of morality and ethics, as well as of jurisprudence, is such as first aroused this otherwise contented plaintiff with the sense of the grievous wrongs she had suffered at the hands of lawyers who had secured her freedom and recovered for her her property, and of purchasers fully paying her for it, setting her upon the enterprise of retaining all received, and at the same time recovering back all conveyed, as well as instructing her (whether in his character legal or sacerdotal I know not) in the appropriate allegations and oaths to be made in that behalf; and who will now have the opportunity, in conclusion, in this high tribunal to enlighten even your honors upon rights like these—rights which have no place in any principles of law or

morality save such as are illustrated and expounded by himself.

For the recovery of her rights I claim and am entitled to but little credit. It is mainly deserved by one whom the pleadings in this case have stigmatised by name with the vilest charges which malignity itself could fasten upon the basest character—M. M. Potter.

He is in his grave, and I repeat expressions heretofore chosen with the strictest propriety, that he left behind him the record and the fame of an honest legislator, an honest lawyer, and an honest man.

There may be differences in the estimate of his abilities and services, but no one, except in this proceeding, has ever denied him that meed and that fame. He had great influence in this community. He possessed a large measure of its confidence. Believing the will of David Webster ought to be carried out, and that she ought to be free, and to have the property bequeathed to her, he gave his exertions at once, prudent and powerful, to effect it. In the Probate Court, in the District Court, in every forum of public opinion he stood her champion and her friend, until her freedom and property were secured to her by the fixed decree of the court of competent jurisdiction, and until it was justified and approved by the common feeling of the community.

Before the earthly, and before the heavenly chancery, who has been the friend and done the right for Betsy Webster?

*Stancel & Stancel*, for appellant, in reply.—Counsel for appellee admits in his brief that confidential trusts can not be transferred, and also recognizes the doctrine, as we understand him, laid down by this court in the case of Purvis v. Sherrod, 12 Tex., 140, and reaffirmed in the case of Hunt v. White, 24 Tex., 643, that slaves could not be emancipated without being removed beyond the limits of the State. This being true, then, Betsy Webster, at the date of defendant's deed, was in law only a chattel herself, and was incapable of contracting or

giving her assent to any contract whatever, as she had not been removed out of the State.

The removal was the condition fixed by law for slaves to take property. We invite the special attention of the court to the case of Bryan v. Walton, 14 Georgia, 185, where Judge Lumpkin delivered a very able opinion on the status of slaves in the slaveholding States, which we think is a case directly in point.

It is not pretended by defendant and appellee that the contract for the defense of the suit against Webster's will was made with Mrs. Hardin, nor any person legally authorized by her to do so, (the administrators being the proper parties to set up the will,) nor is it pretended that she had anything to do with the sale of the lots in question, nor any knowledge of the sale until after it was consummated. But it is insisted that she approved the sale by signing her name to the deed. She states, in answer to the tenth interrogatory, that if she ever signed the deed, it was some of the papers brought to her by her son; she did not know the parties in the deed nor the property conveyed, if any.

The court will find by examining her testimony, that she knew nothing about the transaction whatever, and signed her name at the suggestion of Mr. Potter, who the record shows to be an interested party. And it appears nowhere in the record that Betsy knew anything about Mrs. Hardin's signature being procured to the deed. We, therefore, submit to the court whether a trustee, in contemplation of law, is a mere cypher, or an intelligent being; and whether, in the sale of the lots in question, the discretion, judgment and power was exercised as authorized by David Webster. (See Coke v. Wade, 16 Ves., 27 to 48; Conklin v. Egerton, 21 Wendell, 430; Commercial Bank of Lake Erie v. Norton, 1 Hill, 505, and the authorities therein cited.)

It is insisted by counsel, with some degree of earnestness, that the charges of fraud in plaintiff's pleadings in the court below are not true, and remarked, with some feeling, that Mr.

Potter is dead. The counsel has not forgotten that Col. A. P. Wiley, who repeated the charges of fraud in the second amended petition, is also dead.

We ask the attention of the court to the fact that Mr. Potter was an interested party, as shown by the record, and that Mrs. Hardin, in answer to the sixth and twentieth interrogatories, says that he advised her that she could not accept the trust, and advised her to appoint an attorney in fact to carry out the trust; and, also, his connection with the entire transaction.

At the date of the written agreement between Betsy and Potter & Ballinger, the administrators of David Webster were the legal representatives of his estate, and were bound to set up the will.

If Betsey was laboring under legal disabilities at the time the trade was made, she had the right to rescind it when her disabilities were relieved.

MORRILL, C. J.—By the will of Webster the slave Betsy was either made a free woman or she remained a slave. She was not in part a slave and partly free. If she continued to be a slave, all the legacy left her by the will of her former master, became *ipso facto* the property of the person or persons whom the law designated as his heir or heirs, and for want of such, belonged to the State, and she had no right, title or claim to the same; because, not only a slave, but all the property of a slave, was the property of her owner. If, however, by the will she became a free woman, she was so *in toto*, and was legally vested with the property devised to her, to use it as she pleased, unless she was an infant, insane, or a married woman—neither of which is pretended.

But as a court of competent jurisdiction decreed the will valid, and thereby decreed Betsy a free woman, and as the judgment or decree of this court has never been set aside, reversed or appealed from, but remains and ever has been in full force, virtue, and effect, it thereby follows that from and after the time that this judgment or decree took effect, Betsy

Webster was a free woman.  Being a free woman, and not being under any disabilities requiring a guardian, neither her former master nor the court had any right to appoint a guardian of her person or property.

Such we believe to be the elementary principles of law, as it was when the will of Webster was probated and provisions made to have the same enforced.  She received the estate devised to her directly from the devisor, through the will, and she was just as free to make a contract conveying her property, or a portion thereof, as she was on the day she instituted this suit. If she required a guardian, or a *quasi* guardian, or agent, or trustee to convey property, she also required the same to institute for her the writ on which this action depends.   If the property sued for ever did belong to the plaintiff, she conveyed it with all the forms and ceremonies required by the statute, as well as by the will, by which the property was devised to her, and if it did not, she now has no right to it; and this disposes of the case.

Having disposed of the case so far as relates to the property involved in it, we deem it our duty to make a few observations relative to what is of more value than property to parties indirectly made prominent by the pleadings of plaintiff.   The charges of fraud against her attorneys by the plaintiff have as little foundation to stand upon in the minds of those well acquainted with them, as in the facts disclosed in the record. When we take into consideration what the laws then required, and more especially what public opinion was, relative to making slaves free, and placing them pecuniarily in a position superior to that of a majority of those born free and belonging to a different and dominant race, we are led to believe that no person of less legal ability and tact, of less influence in regulating and controlling public opinion, of less legal, political and moral standing in the community than her counsel, could have saved for her either the property or freedom devised.

Had the plaintiff, instead of expending what she has in this suit, appropriated the same in erecting a monument over the

grave of the lamented Potter, and inscribed thereon what he did for her in the furtherance of the kindness and benevolence of him whose name she assumes, she would thereby have given stronger proof than she now has that her gratitude has not yielded to her avarice.   The judgment is affirmed.

Affirmed.